# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GREGORY ADAMS (DECEASED), RICHARD BALOGH, HARLAND BATES, STEPHEN BEAUCHAMP, SHERIAN BLAKELY (DECEASED), GEORGE HERALD BOHLKEN (DECEASED), JEANETTE BRADLEY, DONALD C. BROWN, DONNA BROWN, JAMES BROWN, TERESA CLAPP, JANET SUE COSTELLO (DECEASED), MARILYN CRANE, YONTREAL DARBY, JANET DAVIS, DOROTHY DAVIS (DECEASED), CHARLES D. DEBORD (DECEASED), RUSSELL DESANZO, EUGENE DEYO, GAYE DOMER, MARGARET DOWD, ROBERT EVEDON, RICHARD FLOOD, SAM FORCE, CHARLES GORDON, SANDRA GREEN, HELEN GRIFFIN, BETTY HARTGROVE, CARY HATFIELD, RYAN HENSON, THOMAS G. JAMES, MARSHA JEFFERS, DAVID JENKINS, PATRICIA JONES, WILMA KLINELINE (DECEASED), LIONEL KOON (DECEASED), JOHNNY LATHAM, CALVIN LEE, THOMAS LIETZKE, DIANE LONG, MARGUERITE LONG, MARY MCAFEE (DECEASED), SUSAN MCAVOY, FRANCES MCCULLOUGH, MARYANN MCDONALD (DECEASED), NANCY MCNAMARA, GLORIA MCSWAIN, GWENDOLYN MICKENS, THOMAS MITCHELL, CLIFTON MOSS, JEAN MOSSOR (DECEASED), AUDRIELLE NELSON, JAMES NELSON, JOE NELSON, LUCILLE ORAVECZ, KARL PAYNE, ELSIE PEDROZA (DECEASED), RONALD L. PHILLIPS (DECEASED), DON PITTMAN, DOROTHY S. PORTER (DECEASED), RHONDA PURVIANCE, CHARLES ROBERTS, GERALD ROBERTS, LONAL ROBINSON (DECEASED), DONALD ROMINGER, KIRBY RUSSELL (DECEASED), DEVON SETTLES, LISA SHEFFIELD, CUEVAS SHELTON, CAROL | MDL NO. 2592<br><br>SECTION:   L<br><br>JUDGE:  ELDON E. FALLON |

1

SHOFF (DECEASED), DIANE SIMPSON
(DECEASED), GARRETT SMITH
(DECEASED), GENE SPENCER (DECEASED),
JOHN STEWART (DECEASED), SHIRELY
TATE, DEBORAH TIPPETT, JULIA TOWER
(DECEASED), CHERYL TUCKER, VENIRA
WALLACE, SHIRLEY WALTZ, JOHN
WARNER, JIM WEISSINGER, DEXTER
WELCH, ROSEMARY WHITE (DECEASED),
LILLIAN WILES (DECEASED), PATRICIA
WOLLMAN (DECEASED),

              Plaintiffs,

      v.

JANSSEN RESEARCH & DEVELOPMENT
LLC f/k/a JOHNSON AND JOHNSON
PHARMACEUTICAL RESEARCH AND
DEVELOPMENT LLC, JANSSEN ORTHO LLC,
JANSSEN PHARMACEUTICALS, INC.
f/k/a JANSSEN PHARMACEUTICA INC.
f/k/a ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.,
JOHNSON & JOHNSON COMPANY
BAYER HEALTHCARE
PHARMACEUTICALS, INC.,
BAYER PHARMA AG,
BAYER CORPORATION,
BAYER HEALTHCARE LLC,
BAYER HEALTHCARE AG, and BAYER AG,

           Defendants.

MAG. JUDGE MICHAEL NORTH

**<u>JURY TRIAL DEMANDED</u>**

2

## JOINT COMPLAINT

Pursuant to Pretrial Order No. 11, Plaintiffs, by and through counsel, file this *Joint Complaint* against Defendants, as follows:

## I.  PLAINTIFF SPECIFIC ALLEGATIONS

Plaintiffs herein are:

1. Gregory Adams (Salt Lake County, Utah)

   a. Plaintiff, Gregory Adams, ingested Xarelto from approximately December 29, 2014 to January 4, 2015 and suffered severe internal bleeding and respiratory failure on January 4, 2015 as a direct result of Xarelto.  Plaintiff Gregory Adams ultimately died due to his injuries on January 11, 2015.  Plaintiff Gregory Adams was a resident of Salt Lake County in the state of Utah.  Plaintiff Gregory Adams is represented herein by Terri Adams, the executor of his estate.

2. Richard Balogh (Polk County, Iowa)

   a. Plaintiff, Richard Balogh, ingested Xarelto from approximately August, 2013 to September, 2013 and suffered a stroke and severe internal bleeding in September, 2013 as a direct result of Xarelto.  Plaintiff Richard Balogh resides in Polk County in the state of Iowa.

3. Harland Bates (Benton County, Washington)

   a. Plaintiff, Harland Bates, ingested Xarelto from approximately June, 2012 to June, 2013 and suffered severe internal bleeding in June, 2013 as a direct result of Xarelto.  Plaintiff Harland Bates resides in Benton County in the state of Washington.

3

4.    Stephen Beauchamp (Collin County, Texas)

    a.    Plaintiff, Stephen Beauchamp, ingested Xarelto from approximately April, 2014 to June, 2014 and suffered severe internal bleeding on June 14, 2014 as a direct result of Xarelto.  Plaintiff Stephen Beauchamp resides in Collin County in the state of Texas.

    b.    In conjunction with Plaintiff Beauchamp's claim, Beverly Beauchamp, spouse of Stephen Beauchamp, asserts a claim for loss of consortium.

5.    Sherian Blakely (Davidson County, North Carolina)

    a.    Plaintiff, Sherian Blakely, ingested Xarelto from approximately June, 2014 to March, 2015 and suffered brain/cerebral hemorrhage in March, 2015 as a direct result of Xarelto.  Plaintiff Sherian Blakely ultimately died due to her injuries on March 21, 2015.  Plaintiff Sherian Blakely was a resident of Davidson County in the state of North Carolina.  Plaintiff Sherian Blakely is represented herein by James Blakely, the executor of her estate.

6.    George Harold Bohlken (Burleigh County, North Dakota)

    a.    Plaintiff, George Harold Bohlken, ingested Xarelto from approximately June, 2014 to October, 2014 and suffered brain hemorrhaging and severe internal bleeding in August, 2014 as a direct result of Xarelto.  Plaintiff George Herald Bohlken ultimately died due to his injuries on November 16, 2014.  Plaintiff George Herald Bohlken was a resident of Burleigh County in the state of North Dakota.  Plaintiff George Herald Bohlken is represented herein by Glenda Snyder, the executor of his estate.

4

7.  Jeanette Bradley (Sussex County, Delaware)

    a.  Plaintiff, Jeanette Bradley, ingested Xarelto from approximately September, 2014 to December, 2014 and suffered severe internal bleeding in December, 2014 as a direct result of Xarelto.  Plaintiff Jeanette Bradley resides in Sussex County in the state of Delaware.

8.  Donald C. Brown (Franklin County, Ohio)

    a.  Plaintiff, Donald C. Brown, ingested Xarelto from approximately January, 2014 to June, 2014 and suffered severe internal bleeding in June 30, 2014 as a direct result of Xarelto.  Plaintiff Donald C. Brown resides in Lucas County in the state of Ohio.

9.  Donna Brown (Dona Ana County, New Mexico)

    a.  Plaintiff, Donna Brown, ingested Xarelto from approximately October, 2013 to December, 2013 and suffered severe internal bleeding in December, 2013 as a direct result of Xarelto.  Plaintiff Donna Brown resides in Dona Ana County in the state of New Mexico.

    b.  In conjunction with Plaintiff Brown's claim, Harold G. Brown, spouse of Donna Brown, asserts a claim for loss of consortium.

10.  James Brown (Haskell County, Oklahoma)

    a.  Plaintiff, James Brown, ingested Xarelto from approximately March 2014 to April 2015 and suffered severe internal bleeding in April, 2015 as a direct result of Xarelto.  Plaintiff James Brown resides in Haskell County in the state of Oklahoma.

5

11.  Teresa Clapp (New Hanover County, North Carolina)

    a.  Plaintiff, Teresa Clapp, ingested Xarelto from approximately February, 2012 to February, 2014 and suffered brain hemmorrage, stroke and severe internal bleeding in February, 2014 as a direct result of Xarelto.  Plaintiff Teresa Clapp resides in New Hanover County in the state of North Carolina.

    b.  In conjunction with Plaintiff Clapp's claim, Mark Allen Clapp, spouse of Teresa Clapp, asserts a claim for loss of consortium.

12.  Janet Sue Costello (Clark County, Nevada)

    a.  Plaintiff, Janet Sue Costello, ingested Xarelto from approximately March, 2014 to December 30, 2014 and suffered severe internal bleeding in December, 2014 as a direct result of Xarelto.  Plaintiff Janet Sue Costello ultimately died due to her injuries on December 30, 2014.  Plaintiff Janet Sue Costello was a resident of Clark County in the state of Nevada.  Plaintiff Janet Sue Costello is represented herein by Sara Foley, the executor of her estate.

13.  Marilyn Crane (Pottawatomie County, Oklahoma)

    a.  Plaintiff, Marilyn Crane, ingested Xarelto from approximately August, 2013 to the present and suffered severe internal bleeding in August, 2013 as a direct result of Xarelto.  Plaintiff Marilyn Crane resides in Pottawatomie County in the state of Oklahoma.

14.  Yontreal Darby (Anderson County, South Carolina)

    a.  Plaintiff, Yontreal Darby, ingested Xarelto from approximately January, 2015 to the present and suffered severe internal bleeding in February, 2015 as a direct

result of Xarelto.  Plaintiff Yontreal Darby resides in Anderson County in the state of South Carolina.

15.  Janet Davis (Person County, North Carolina)

    a.  Plaintiff, Janet Davis, ingested Xarelto from approximately April, 2014 to June, 2015 and suffered severe internal bleeding in November, 2014 as a direct result of Xarelto.  Plaintiff Marilyn Crane resides in Person County in the state of North Carolina.

16.  Dorothy Davis (Harrison County, Texas)

    a.  Plaintiff, Dorothy Davis, ingested Xarelto from approximately January, 2013 to February, 2014 and suffered acute blood loss and anemia in February, 2014 as a direct result of Xarelto.  Plaintiff Dorothy Davis ultimately died due to his injuries on February 21, 2014.  Plaintiff Dorothy Davis was a resident of Harrison County in the state of Texas.  Plaintiff Dorothy Davis is represented herein by Gloria McMillan, the executor of his estate.

17.  Charles D. Debord (Cherokee County, Georgia)

    a.  Plaintiff, Charles D. Debord, ingested Xarelto from approximately March, 2014 to February, 2015 and suffered severe internal bleeding in January, 2015 as a direct result of Xarelto.  Plaintiff Charles D. Debord ultimately died due to his injuries on February 12, 2015.  Plaintiff Charles D. Debord was a resident of Cherokee County in the state of Georgia.  Plaintiff Charles D. Debord is represented herein by Michael Debord, the executor of his estate.

18.  Russell Desanzo (Lawrence County, Pennsylvania)

   a.  Plaintiff, Russell Desanzo, ingested Xarelto from approximately June, 2013 to July, 2014 and suffered severe internal bleeding on July 3, 2014 as a direct result of Xarelto.  Plaintiff Russell Desanzo resides in Lawrence County in the state of Pennsylvania.

19.  Eugene Deyo (Custer County, South Dakota)

   a.  Plaintiff, Eugene Deyo, ingested Xarelto from approximately September 29, 2014 to November 20, 2014 and suffered severe internal bleeding on November 20, 2014 as a direct result of Xarelto.  Plaintiff Eugene Deyo resides in Custer County in the state of South Dakota.

   b.  In conjunction with Plaintiff Deyo's claim, DiAnn K. Deyo, spouse of Eugene Deyo, asserts a claim for loss of consortium.

20.  Gaye Domer (Washington County, Maryland)

   a.  Plaintiff, Gaye Domer, ingested Xarelto from approximately February, 2013 through November, 2013 and suffered severe internal bleeding in November 26, 2013 as a direct result of Xarelto.  Plaintiff Gaye Domer resides in Washington County in the state of Maryland.

21.  Margaret Dowd (Red Willow County, Nebraska)

   a.  Plaintiff, Margaret Dowd, ingested Xarelto from approximately January, 2014 to July 21, 2014 and suffered severe internal bleeding on July 21, 2014 as a direct result of Xarelto.  Plaintiff Margaret Dowd resides in Red Willow County in the state of Nebraska.

8

> b. In conjunction with Plaintiff Dowd's claim, James Dowd, spouse of Margaret Dowd, asserts a claim for loss of consortium.

22. Robert Evedon (Palm Beach County, Florida)

> a. Plaintiff, Robert Evedon, ingested Xarelto from approximately November, 2014 to February, 2015 and suffered severe internal bleeding in January, 2015 and February, 2015 as a direct result of Xarelto. Plaintiff Robert Evedon resides in Palm Beach County in the state of Florida.

> b. In conjunction with Plaintiff Evendon's claim, Barbara Evendon, spouse of Robert Evendon, asserts a claim for loss of consortium.

23. Richard Flood (El Paso County, Texas)

> a. Plaintiff, Richard Flood, ingested Xarelto from approximately 2012 to December, 2012 and suffered brain hemorrhaging and severe internal bleeding on December, 2012 as a direct result of Xarelto. Plaintiff Richard Flood resides in El Paso County in the state of Texas.

24. Sam Force (Shelby County, Tennessee)

> a. Plaintiff, Sam Force, ingested Xarelto from approximately August, 2014 to March 16, 2015 and suffered severe internal bleeding in January, 2015 as a direct result of Xarelto. Plaintiff Sam Force resides in Shelby County in the state of Tennessee.

25. Charles Gordon (Broward County, Florida)

> a. Plaintiff, Charles Gordon, ingested Xarelto from approximately April 5, 2013 to May 4, 2013 and suffered severe internal bleeding on May 4, 2013 as a direct

result of Xarelto.  Plaintiff Charles Gordon resides in Broward County in the state of Florida.

26.   Sandra Green (Jefferson County, Colorado)

   a.   Plaintiff, Sandra Green, ingested Xarelto from approximately November, 2014 to March, 2015 and suffered severe internal bleeding in November, 2014 as a direct result of Xarelto.  Plaintiff Sandra Green resides in Jefferson County in the state of Colorado.

27.   Helen Griffin (Cook County,  Illinois)

   a.   Plaintiff, Helen Griffin, ingested Xarelto from approximately October, 2013 to November, 2014 and suffered severe internal bleeding on March 25, 2014, May, 2014 and September, 2014 as a direct result of Xarelto.  Plaintiff Helen Griffin resides in Cook County in the state of Illinois.

28.   Betty Hartgrove (Clark County, Kentucky)

   a.   Plaintiff, Betty Hartgrove, ingested Xarelto from approximately June, 2013 to May, 2014 and suffered severe internal bleeding on April, 2014 as a direct result of Xarelto.  Plaintiff Betty Hartgrove resides in Clark County in the state of Kentucky.

29.   Cary Hatfield (Porter County, Indiana)

   a.   Plaintiff, Cary Hatfield, ingested Xarelto from approximately January, 2013 to February 24, 2015 and suffered severe internal bleeding on February 24, 2015 as a direct result of Xarelto.  Plaintiff Cary Hatfield resides in Porter County in the state of Indiana.

10

b.  In conjunction with Plaintiff Hatfield's claim, Robert Hatfield, spouse of Cary Hatfield, asserts a claim for loss of consortium.

30.  Ryan Henson (Androscoggin County, ME)

a.  Plaintiff, Ryan Henson, ingested Xarelto from approximately February 1, 2014 to March 1, 2014 and suffered severe internal bleeding in March, 2014 as a direct result of Xarelto.  Plaintiff Ryan Henson resides in Androscoggin County in the state of ME.

31.  Thomas G. James (Trumbull County, OH)

a.  Plaintiff, Thomas G. James, ingested Xarelto from approximately June 1, 2014 to July 1, 2014 and suffered severe internal bleeding in July, 2014 as a direct result of Xarelto.  Plaintiff Thomas G. James resides in Trumbull County in the state of OH.

32.  Marsha Jeffers (Walker County, GA)

a.  Plaintiff, Marsha Jeffers, ingested Xarelto from approximately January 1, 2014 to July 1, 2014 and suffered severe internal bleeding in July, 2014 as a direct result of Xarelto.  Plaintiff Marsha Jeffers resides in Walker County in the state of GA.

33.  David Jenkins (Cuyahoga County, OH)

a.  Plaintiff, David Jenkins, ingested Xarelto from approximately September 1, 2014 to November 10, 2014 and suffered severe internal bleeding in November, 2014 as a direct result of Xarelto.  Plaintiff David Jenkins resides in Cuyahoga County in the state of OH.

34.   Patricia Jones (Putnam County, IN)

   a.   Plaintiff, Patricia Jones, ingested Xarelto from approximately March 1, 2015 to
        March 1, 2015 and suffered severe internal bleeding in March, 2015 as a direct
        result of Xarelto.  Plaintiff Patricia Jones resides in Putnam County in the state
        of IN.

35.   Wilma Klineline (Deceased) (Greene County, MO)

   a.   Plaintiff, Wilma Klineline (Estate), ingested Xarelto from approximately
        January 1, 2012 to November 1, 2014 and suffered severe internal bleeding and
        stroke in November, 2014 as a direct result of Xarelto. Plaintiff Wilma
        Klineline was a resident of Greene County in the state of MO. Plaintiff Wilma
        Klineline is herein represented by Jacki Scriuner, the executor of her estate.

36.   Lionel Koon (Estate) (Madison County, ID)

   a.   Plaintiff, Lionel Koon, ingested Xarelto from approximately June 1, 2014 to
        November 1, 2014 and suffered severe internal bleeding in November, 2014 as
        a direct result of Xarelto.  Plaintiff Lionel Koon was a resident of Madison
        County in the state of ID. Plaintiff Lionel Koon will be represented by an
        appointed representative of his estate.

37.   Johnny Latham (Lauderdale County, MS)

   a.   Plaintiff, Johnny Latham, ingested Xarelto from approximately January 1, 2012
        to September 1, 2013 and suffered severe internal bleeding and gastrointestinal
        hemorrhaging in September, 2013 as a direct result of Xarelto.  Plaintiff Johnny
        Latham resides in Lauderdale County in the state of MS.

12

38.  Calvin Lee (Dale County, AL)

    a.  Plaintiff, Calvin Lee, ingested Xarelto from approximately January 1, 2013 to October 1, 2013 and suffered severe internal bleeding in October, 2013 as a direct result of Xarelto.  Plaintiff Calvin Lee resides in Dale County in the state of AL.

39.  Thomas Lietzke (Hennepin County, MN)

    a.  Plaintiff, Thomas Lietzke, ingested Xarelto from approximately November 1, 2014 to December 7, 2014 and suffered severe internal bleeding in December, 2014 as a direct result of Xarelto.  Plaintiff Thomas Lietzke resides in Hennepin County in the state of MN.

40.  Diane Long (Montgomery County, TX)

    a.  Plaintiff, Diane Long, ingested Xarelto from approximately February 1, 2015 to February 1, 2015 and suffered severe internal bleeding in February, 2015 as a direct result of Xarelto.  Plaintiff Diane Long resides in Montgomery County in the state of TX.

41.  Marguerite Long (Washington Parish County, LA)

    a.  Plaintiff, Marguerite Long, ingested Xarelto from approximately September 1, 2014 to October 4, 2014 and suffered severe internal bleeding in October, 2014 as a direct result of Xarelto.  Plaintiff Marguerite Long resides in Washington Parish County in the state of LA.

42.  Mary McAfee (Deceased) (McNairy County, TN)

    a.  Plaintiff, Mary McAfee, ingested Xarelto from approximately January 1, 2014
        to October 1, 2014 and suffered severe internal bleeding in October, 2014 as a
        direct result of Xarelto. Plaintiff Mary McAfee was a resident of McNairy
        County in the state of TN. Plaintiff Mary McAfee is herein represented by
        Jennifer Kitchen, the executor of her estate.

43.  Susan McAvoy (Columbia County, NY)

    a.  Plaintiff, Susan McAvoy, ingested Xarelto from approximately March 1, 2014
        to April 1, 2014 and suffered severe internal bleeding in April, 2014 as a direct
        result of Xarelto.  Plaintiff Susan McAvoy resides in Columbia County in the
        state of NY.

44.  Frances McCullough (Chester County, PA)

    a.  Plaintiff, Frances McCullough, ingested Xarelto from approximately February
        1, 2015 to March 1, 2015 and suffered severe internal bleeding and brain
        hemorrhaging in March, 2015 as a direct result of Xarelto.  Plaintiff Frances
        McCullough resides in Chester County in the state of PA.

45.  Maryann McDonald (Deceased) (Lawrence County, PA)

    a.  Plaintiff, Maryann McDonald, ingested Xarelto from approximately January 1,
        2015 to April 20, 2015 and suffered severe internal bleeding in April, 2015 as
        a direct result of Xarelto. Plaintiff ultimately died due to her injuries on April
        20, 2015. Plaintiff Maryann McDonald was a resident of Lawrence County in

14

the state of PA. Plaintiff Maryann McDonald is herein represented by Cheryl Bulisco, the executor of her estate.

46.  Nancy McNamara (Maricopa County, AZ)

   a.  Plaintiff, Nancy McNamara, ingested Xarelto from approximately January 1, 2014 to November 1, 2014 and suffered severe internal bleeding in November, 2014 as a direct result of Xarelto.  Plaintiff Nancy McNamara resides in Maricopa County in the state of AZ.

47.  Gloria McSwain (Forrest County, MS)

   a.  Plaintiff, Gloria McSwain, ingested Xarelto from approximately July 1, 2014 to January 1, 2015 and suffered severe internal bleeding in January, 2015 as a direct result of Xarelto.  Plaintiff Gloria McSwain resides in Forrest County in the state of MS.

48.  Gwendolyn Mickens (Jefferson County, AL)

   a.  Plaintiff, Gwendolyn Mickens, ingested Xarelto from approximately January 9, 2012 to July 1, 2013 and suffered severe internal and adrenal bleeding in July, 2013 as a direct result of Xarelto.  Plaintiff Gwendolyn Mickens resides in Jefferson County in the state of AL.

49.  Thomas Mitchell (Kern County, CA)

   a.  Plaintiff, Thomas Mitchell, ingested Xarelto from approximately January 1, 2014 to December 30, 2014 and suffered severe internal bleeding in July, 1905 as a direct result of Xarelto.  Plaintiff Thomas Mitchell resides in Kern County in the state of CA.

50.  Clifton Moss (Jones County, MS)

   a.  Plaintiff, Clifton Moss, ingested Xarelto from approximately October 1, 2014
       to December 1, 2014 and suffered severe internal bleeding and stroke in
       December, 2014 as a direct result of Xarelto.  Plaintiff Clifton Moss resides in
       Jones County in the state of MS.

51.  Jean Mossor (Estate) (Stark County, OH)

   a.  Plaintiff, Jean Mossor (Estate), ingested Xarelto from approximately February
       14, 2014 to February 17, 2014 and suffered severe internal bleeding in
       February, 2014 as a direct result of Xarelto.  Plaintiff Jean Mossor (Estate)
       resides in Stark County in the state of OH.

52.  Audrielle Nelson (Douglas County, NE)

   a.  Plaintiff, Audrielle Nelson, ingested Xarelto from approximately June 1, 2013
       to November 5, 2013 and suffered severe internal bleeding in November, 2013
       as a direct result of Xarelto.  Plaintiff Audrielle Nelson resides in Douglas
       County in the state of NE.

53.  James Nelson (Baltimore County, MD)

   a.  Plaintiff, James Nelson, ingested Xarelto from approximately January 22, 2014
       to February 12, 2014 and suffered severe internal bleeding in February, 2014 as
       a direct result of Xarelto.  Plaintiff James Nelson resides in Baltimore County
       in the state of MD.

54.  Joe Nelson (Muhlenberg County, KY)

   a.  Plaintiff, Joe Nelson, ingested Xarelto from approximately January 1, 2012 to
       August 1, 2012 and suffered severe internal bleeding in August, 2012 as a direct
       result of Xarelto.  Plaintiff Joe Nelson resides in Muhlenberg County in the state
       of KY.

55.  Lucille Oravecz (Cuyahoga County, OH)

   a.  Plaintiff, Lucille Oravecz, ingested Xarelto from approximately January 1,
       2013 to February 1, 2015 and suffered severe internal bleeding and retinal
       hemorrhaging in February, 2015 as a direct result of Xarelto.  Plaintiff Lucille
       Oravecz resides in Cuyahoga County in the state of OH.

56.  Karl Payne (San Joaquin County, CA)

   a.  Plaintiff, Karl Payne, ingested Xarelto from approximately July 1, 2013 to July
       1, 2014 and suffered severe internal bleeding in July, 2014 as a direct result of
       Xarelto.  Plaintiff Karl Payne resides in San Joaquin County in the state of CA.

57.  Elsie Pedroza (Deceased) (Santa Clara County, California)

   a.  Plaintiff, Elsie Pedroza, ingested Xarelto from approximately 2012 to 2013 and
       suffered severe internal bleeding in March, 2014 as a direct result of Xarelto.
       Plaintiff Elsie Pedroza was a resident of Santa Clara County in the state of
       California. Plaintiff Elsie Pedroza is herein represented by Corina Hernandez,
       the executor of her estate.

17

58.   Ronald L. Phillips (Deceased) (Walker County, Alabama)

    a.   Plaintiff, Ronald L. Phillips, ingested Xarelto on June 7, 2014 and suffered severe internal bleeding as a direct result of Xarelto. Plaintiff Ronald L. Phillips was a resident of Walker County in the state of Alabama. Plaintiff Ronald L. Phillips is herein represented by Ruth Phillips, the executor of his estate.

59.   Ron Pittman (Tarrant County, Texas)

    a.   Plaintiff, Ron Pittman, ingested Xarelto from approximately September, 2014 to October, 2014 and suffered severe internal bleeding in October, 2014 as a direct result of Xarelto. Plaintiff Ron Pittman resides in Torrant County in the state of Texas.

60.   Rhoda Purviance (Weston County, Wyoming)

    a.   Plaintiff, Rhoda Purviance, ingested Xarelto on approximately September 12, 2013 and suffered a gastrointestinal bleed and other internal bleeding on September 12, 2013 as a direct result of Xarelto. Plaintiff Rhoda Purviance resides in Weston County in the state of Wyoming.

61.   Dorothy Porter (Deceased) (Potter County, Texas)

    a.   Plaintiff, Dorothy Porter, ingested Xarelto from approximately March 24, 2014 to May 16, 2014 and suffered brain hemorrhaging on May 16, 2014 as a direct result of Xarelto. Plaintiff Dorothy Porter ultimately died due to her injuries on May 16, 2014. Plaintiff Dorothy Porter was a resident of Gray County in the state of Texas. Plaintiff Dorothy Porter is herein represented by Cherilyn Patterson, the executor of her estate.

62.  Charles Roberts (St. Clair County, Alabama)

    a.  Plaintiff, Charles Roberts, ingested Xarelto from approximately May 2014 to October 2014 and suffered severe internal bleeding in May 2014 as a direct result of Xarelto.  Plaintiff Charles Roberts resides in St. Clair County in the state of Alabama.

    b.  In conjunction with Plaintiff Roberts' claim, Sarah Roberts, spouse of Charles Roberts, asserts a claim for loss of consortium.

63.  Gerald Roberts (Belmont County, Ohio)

    a.  Plaintiff, Gerald Roberts, ingested Xarelto from approximately 2012 to September 2014, and suffered severe internal bleeding as a direct result of Xarelto.  Plaintiff Gerald Roberts resides in Belmont County in the state of Ohio.

    b.  In conjunction with Plaintiff Roberts' claim, Kathy Roberts, spouse of Gerald Roberts, asserts a claim for loss of consortium.

64.  Lonal Robinson (Deceased) (Harris County, Texas)

    a.  Plaintiff, Lonal Robinson, ingested Xarelto from approximately 2011 to March 17, 2012, and suffered severe internal bleeding and hemorrhaging on March 17, 2012 as a direct result of Xarelto. Plaintiff Lonal Robinson ultimately died due to his injuries on March 17, 2012. Plaintiff Lonal Robinson was a resident of Harris County in the state of Texas. Plaintiff Lonal Robinson is herein represented by Doris Robinson, the executor of his estate.

    b.  In conjunction with Plaintiff Robinson's claim, Doris Robinson, spouse of Lonal Robinson, asserts a loss of consortium claim.

65.  Donald Rominger (Yolo County, California)

    a.  Plaintiff, Donald Rominger, ingested Xarelto from approximately January 2013, to March 10, 2015 and suffered internal bleeding on March 10, 2015, as a direct result of Xarelto.  Plaintiff Donald Rominger resides in Yolo County in the state of California.

66.  Kirby Leroy Russell (Deceased) (Davidson County, Tennessee)

    a.  Plaintiff, Kirby Leroy Russell, ingested Xarelto from approximately 2011 to February 2012 and suffered internal bleeding on February 12, 2012 as a direct result of Xarelto. Plaintiff Kirby Leroy Russell was a resident of Davidson County in the state of Tennessee. Plaintiff Kirby Leroy Russell is herein represented by Rhoda Fuller, the executor of her estate.

67.  Devon Settles (Geauga County, Ohio)

    a.  Plaintiff, Devon Settles, ingested Xarelto from approximately August 2014 to November 7, 2014 and suffered severe internal bleeding on November 7 2014, as a direct result of Xarelto.  Plaintiff Devon Settles resides in Geauga County in the state of Ohio.

68.  Lisa Sheffield (Manatee, Florida)

    a.  Plaintiff, Lisa Sheffield, ingested Xarelto from approximately May 2014 to January 2015, and suffered severe internal bleeding in September of 2014 as a

direct result of Xarelto. Plaintiff Lisa Sheffield resides in Manatee County in the state of Florida.

69. Cuevas Shelton (Miami-Dade County, Florida)

    a. Plaintiff, Cuevas Shelton, ingested Xarelto from approximately January 2014, to July 2014, and suffered severe internal bleeding in July 2014 as a direct result of Xarelto. Plaintiff Cuevas Shelton is a resident of Miami-Dade County in the state of Florida.

70. Carol Shoff (Deceased) (Westmoreland County, Pennsylvania)

    a. Plaintiff, Carol Shoff (Deceased), ingested Xarelto from approximately January 2014, to October 12, 2014 and suffered severe internal bleeding on October 12, 2014, as a direct result of Xarelto. Plaintiff Carol Shoff ultimately died due to her injuries on October 14, 2014. Plaintiff Carol Shoff was a resident of Westmoreland County in the state of Pennsylvania. Plaintiff Carol Shoff is herein represented by Amy Kassimatis, the executor of her estate.

71. Diane Simpson (Deceased) (Tarrant County, Texas)

    a. Plaintiff, Diane Simpson (Deceased), ingested Xarelto from approximately March 2014, to May 18, 2015 and suffered severe internal bleeding on May 18, 2015 as a direct result of Xarelto. Plaintiff Diane Simpson ultimately died due to her injuries on June 6. 2015. Plaintiff Diane Simpson was a resident of Tarrant County in the state of Texas. Plaintiff Diane Simpson is herein represented by Perrita Scott, the executor of her estate.

21

72. Garrett Smith (Deceased) (Pima County, Arizona)

   a. Plaintiff, Garrett Smith, ingested Xarelto from approximately November 2014 to January 9, 2015 and suffered severe internal bleeding on January 9 2015, as a direct result of Xarelto. Plaintiff Garrett Smith ultimately died due to his injuries on January 9, 2015. Plaintiff Garrett Smith was a resident of Pima County in the state of Arizona. Plaintiff Garrett Smith is herein represented by Marietta Smith, the executor of his estate.

73. Gene Spencer (Deceased) (Marion County, Indiana)

   a. Plaintiff, Gene Spencer, ingested Xarelto from approximately 2013 to January 13 2015, and suffered severe internal bleeding on January 13 2015, as a direct result of Xarelto. Plaintiff Gene Spencer ultimately died due to his injuries on January 18, 2015. Plaintiff Gene Spencer was a resident of Marion County in the state of Indiana. Plaintiff Gene Spencer is herein represented by Helen Spencer, the executor of his estate.

74. John Stewart (Deceased) (Okemah County, Oklahoma)

   a. Plaintiff, John Stewart (Deceased), ingested Xarelto from approximately 2012, to 2014, and suffered severe internal bleeding in 2014 as a direct result of Xarelto. Plaintiff John Stewart ultimately died due to his injuries. Plaintiff John Stewart was a resident of Okemah County in the state of Oklahoma. Plaintiff John Stewart is herein represented by Carla Stewart, the executor of his estate.

75.  Shirley Tate (Cherokee County, South Carolina)

    a.  Plaintiff, Shirley Tate, ingested Xarelto from approximately 2012, to August, 2013 and suffered severe internal bleeding in August 2013, as a direct result of Xarelto. Plaintiff Shirley Tate resides in Cherokee County in the state of South Carolina.

76.  Deborah Tippett (Bay County, Michigan)

    a.  Plaintiff, Deborah Tippett, ingested Xarelto from approximately November 2013, to December 2013 and suffered severe internal bleeding in December, 2013 as a direct result of Xarelto.  Plaintiff Deborah Tippett is a resident of Bay County in the state of Michigan.

77.  Julia Tower (Deceased) (Calcasieu Parish County, Louisiana)

    a.  Plaintiff, Julia Tower, ingested Xarelto from approximately September 19, 2014, to October 9, 2014 and suffered severe internal bleeding on October 10 2014, as a direct result of Xarelto.  Plaintiff Julia Tower ultimately died due to his injuries on October 18, 2014. Plaintiff Julia Tower was a resident of Calcasieu Parish County in the state of Louisiana. Plaintiff Julia Tower is herein represented by Carla Doucet, the executor of his estate.

78.  Cheryl Tucker (Butler County, Pennsylvania)

    a.  Plaintiff, Cheryl Tucker, ingested Xarelto from approximately August 2014 to February 2015, and suffered severe internal bleeding on February 11 2015, as a direct result of Xarelto.  Plaintiff Cheryl Tucker is a resident of Butler County in the state of Pennsylvania.

79.  Venira Wallace (Sumter County, Alabama)

   a.  Plaintiff, Venira Wallace, ingested Xarelto starting approximately 2014, to December 2014, and suffered severe internal bleeding in December 2014 as a direct result of Xarelto. Plaintiff Venira Wallace is a resident of Sumter County in the state of Alabama.

80.  Shirley Waltz (Morris County, New Jersey)

   a.  Plaintiff, Shirley Waltz, ingested Xarelto from approximately October 28, 2014, to December 15, 2014 and suffered severe internal bleeding on December 17, 2014, as a direct result of Xarelto. Plaintiff Shirley Waltz resides in Morris County in the state of New Jersey.

81.  John Warner (Clark County, Kentucky)

   a.  Plaintiff, John Warner, ingested Xarelto in approximately May of 2014 and suffered severe internal bleeding on May 23, 2014, as a direct result of Xarelto. Plaintiff John Warner is a resident of Clark County in the state of Kentucky.

82.  Jim Weissinger (Monroe County, New York)

   a.  Plaintiff, Jim Weissinger, ingested Xarelto from approximately August 26, 2013, to October 25, 2014, and suffered severe internal bleeding on October 25 2014, as a direct result of Xarelto.  Plaintiff Julia Tower is a resident of Monroe County in the state of New York.

83.  Dexter Welch (Davidson County, Tennessee)

   a.  Plaintiff, Dexter Welch, ingested Xarelto in approximately 2013 and suffered severe internal bleeding in approximately 2013, as a direct result of Xarelto.

Plaintiff Dexter Welch is a resident of Davidson County in the state of Tennessee.

84.   Rosemary White (Deceased) (Hertford County, North Carolina)

    a.   Plaintiff, Rosemary White, ingested Xarelto starting approximately 2011, to October 2014, and suffered severe internal bleeding in October 2014 as a direct result of Xarelto. Plaintiff Rosemary White was a resident of Hertford County in the state of North Carolina. Plaintiff Rosemary White is herein represented by Maria Jones, the executor of her estate.

85.   Lillian Mae Wiles (Deceased) (Aiken County, South Carolina)

    a.   Plaintiff, Lillian Mae Wiles, ingested Xarelto in approximately November, 2014, and suffered severe internal bleeding in November, 2014, as a direct result of Xarelto. Plaintiff Lillian Mae Wiles ultimately died due to her injuries on November 11, 2014. Plaintiff Lillian Mae Wiles resided in Aiken County in the state of South Carolina. Plaintiff Lillian Mae Wiles is herein represented by Sharon Oswald, the executor of her estate.

86.   Patricia Wollman (Deceased) (Mohave County, Arizona)

    a.   Plaintiff, Patricia Wollman, ingested Xarelto in approximately October of 2014 and suffered severe internal bleeding on October 10, 2014, as a direct result of Xarelto.  Plaintiff Patricia Wollman ultimately died due to her injuries on October 16, 2014. Plaintiff Patricia Wollman was a resident of Mohave County in the state of Arizona. Plaintiff Patricia Wollman is herein represented by Garet Wollman, the executor of her estate.

II.   **DEFENDANTS**

87.   Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332.

88.   As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

89.   Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

90.   Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

91.   Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a   JANSSEN   PHARMACEUTICA   INC.   f/k/a   ORTHO-MCNEIL-JANSSEN

PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business in New Jersey.

92.    As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

93.    Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

94.    Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

95.    As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

96.    Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary

27

purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

97.    Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

98.    As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

99.    Upon    information    and    belief,    Defendant    BAYER    HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

100.    As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

101.    Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

102. Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

103. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG.  Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

104. Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

105. Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

106. As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

107. Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

108. Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

109. Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

29

110. At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

111. Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd., Whippany, New Jersey 07981-1544.

    **a.** Upon information and believe, from on or about early January 1, 2003 until on or about late December, 2014, BAYER HEALTHCARE LLC'S sole member was Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

    **b.** Upon information and belief, from on or about early January, 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC'S sole member was Bayer Medical Care, Inc., and is wholly owned by Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

    **c.** Upon information and belief, from on or about July 1, 2015 to the present, BAYER HEALTHCARE LLC'S members are:

        i. Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

30

ii.  NippoNex Inc., a Delaware corporation with its principal place of business in New York;

iii.  Bayer West Coast Corporation, a Delaware Corporation with its principal place of business in California;

iv.  Bayer Essure Inc., a Delaware corporation with its principal place of business in California;

v.  Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.  Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.  Dr. Scholl's LLC, a limited liability company, formed in Delaware with its principal place of business in California;

vii.  Coppertone LLC, a limited liability company, formed in Delaware with its principal place of business in California;

viii.  MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and,

ix.  Bayer HealthCare U.S. Funding LLC, a limited liability company, formed in Delaware with its principal place of business in Pennsylvania.

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, New Yor, Indiana, Pennsylvania, and California for purposes of determining diversity under 28 U.S.C. § 1332.

112. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

113. Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

114. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

115. Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

116. Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

117. Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

118. Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

119. At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

120. At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

121. At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

III.    **JURISDICTION AND VENUE**

122.    Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332, in that in each of the constituent actions there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

123.    Defendants have significant contacts in the vicinage of Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

124.    A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the vicinage of Plaintiff's residence, as well as in this district. Pursuant to 28 U.S.C. § 1391(a), venue is proper in both districts.

125.    Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, *In re Xarelto (Rivaroxaban) Products Liab. Litig.*, 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

IV.    **FACTUAL ALLEGATIONS**

A.    **Nature of the Case**

126.    Plaintiffs bring this case against Defendants for damages associated with ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants. Specifically, Plaintiffs suffered various injuries, serious physical pain and suffering, medical, hospital and surgical expenses, loss of consortium, and/or death and funeral expenses as a direct result of their use of Xarelto.

127.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of

stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

128.    Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

129.    This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

130.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

131.    Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

132.    Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty. N. Engl. J. Med. 2008;

358:2776-86; Kakkar, A.K., et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomized controlled trial. Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008; 358:2765-75.).

133.     Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI")—rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015)).

134.     Nevertheless, Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439). Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

135.     The Rocket AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper,

lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

136.    The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

137.    In fact, in the ROCKET AF study, the warfarin group was not well managed. The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

138.    The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document. P. 10.

139.    Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval... The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm..." http://www.citizen.org/documents/1974.pdf.

140.    Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily

dosing during Phase 3 is not strong.  Most importantly, there is clinical information from Phase 2 trials … and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile."  FDA advisory Committee Briefing document p. 100.

141.    Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake…"  FDA Advisory Meeting Transcript p. 287.

142.    Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies.  The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding.  At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information."  (NDA 202439 Summary Review, p. 9).    At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

143.    The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

144.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of

DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN- PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012; 366:1287-97.)

145.    Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

146.    Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

147.    Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than

warfarin, and does not limit a patient's diet.  The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference."

148.     However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

149.     In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"),  noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

150.     The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event. The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

151.     Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

152.     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

153.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

154.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

155.    The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

156.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

157.    Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

158.    Despite the clear signal generated by the SAE data, Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

159.   Defendants' original, and in some respects, current labeling and prescribing

information for Xarelto:

(a)   failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b)   failed to provide adequate warnings, about the true safety risks associated with the use of Xarelto;

(c)   failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d)   failed to disclose the need for dose adjustments;

(e)   failed to disclose the need to twice daily dosing;

(f)   failed to warn about the need for blood monitoring;

(g)   failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(h)   failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(i)   failed to advise prescribing physicians, such as the Plaintiffs' physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(j)   failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(k)   failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(l)   failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

(m)   failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

42

(n) failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(o) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(p) failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(q) failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(r) in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for blood monitoring or to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

160.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 74 (a – r).

161.    Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

43

B.    **Over-Promotion of Xarelto**

162.    Xarelto is the second most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

163.    Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

164.    Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales. The "Xarelto Difference," *i.e.*, was once a day dosing without blood monitoring.  In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

165.    As a result of Defendants' aggressive marketing efforts, in its first full year on the market, Xarelto garnered approximately $582 million in sales globally.

166.    Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

167.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than $1 billion, which is the threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the

2013 fiscal year, and Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

168.    As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

169.    In the course of these DTC advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and, that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

170.    On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

171.    Prior to Plaintiffs' ingestion of Xarelto, Plaintiffs became aware of the promotional materials described herein.

172.    Prior to Plaintiffs' prescription of Xarelto, Plaintiffs' prescribing physician received promotional materials and information from sales representatives of Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial

fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice a day dosing or adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

173.    At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

174.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, and twice a day dosing, and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto, and, that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

175.    Prior to applying to the FDA for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

176.    As a result of Defendants' claim regarding the effectiveness and safety of Xarelto, Plaintiffs' medical providers prescribed and Plaintiffs ingested Xarelto.

C.    **The Plaintiffs' Use of Xarelto and Resulting Injuries**

177.    By reason of the foregoing acts and omissions, Plaintiffs were caused to suffer from life-threatening bleeding, as well as other severe and personal injuries (for some, wrongful death) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings, among other damages.

178.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

179.    Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiffs' prescribing physicians or Plaintiffs that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically life-threatening bleeding.

180.    Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

181.    Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

47

182. Upon information and belief, Defendants failed to warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

183. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

184. Defendants' fraudulent concealment and misrepresentations were designed to prevent, and did prevent, the public and the medical community at large from discovering the risks and dangers associated with Xarelto and Plaintiffs from discovering, and/or with reasonable diligence being able to discover, their causes of action.

185. Defendants' fraudulent representations and concealment evidence flagrant, willful, and depraved indifference to health, safety, and welfare. Defendants' conduct showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to the consequences of said conduct.

186. By reason of the forgoing acts and omissions, Plaintiffs have suffered damages and harm, including, but not limited to, personal injury, medical expenses, other economic harm, as well as, where alleged, loss of consortium, services, society, companionship, love and comfort.

## V.    CLAIMS FOR RELIEF

### COUNT I
### (STRICT LIABILITY)

187.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

188.    At the time of Plaintiffs' injuries, Defendants' pharmaceutical drug Xarelto was defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

189.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Plaintiff.

190.    Defendants' Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

191.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

192.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

49

193.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

194.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

195.    Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

196.    At the time of the Plaintiffs' use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

197.    Defendants, with this knowledge, voluntarily designed their Xarelto in a dangerous condition for use by the public, and in particular the Plaintiffs.

198.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

199.    Defendants created a product unreasonably dangerous for its normal, intended use.

200.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

50

201. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

202. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiffs in particular; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs.

203. The Plaintiffs could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

204. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

205. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

206. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent

health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

207.    The Xarelto ingested by Plaintiffs was in the same or substantially similar condition as it was when it left the possession of Defendants.

208.    Plaintiffs did not misuse or materially alter their Xarelto.

209.    Defendants are strictly liable for Plaintiffs' injuries in the following ways:

    a.    Xarelto as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

    b.    Defendants failed to properly market, design, manufacture, distribute, supply and sell Xarelto;

    c.    Defendants failed to warn and place adequate warnings and instructions on Xarelto;

    d.    Defendants failed to adequately test Xarelto;

    e.    Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Xarelto, and,

    f.    A feasible alternative design existed that was capable of preventing Plaintiffs' injuries.

210.    By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

211.    Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

212.     That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiffs' injuries.

213.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries (in some cases death) which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

214.     Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT II
## (MANUFACTURING DEFECT)

215.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

216.     Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

217.    When it left the control of Defendants, Xarelto was expected to, and did reach Plaintiffs without substantial change from the condition in which it left Defendants' control.

218.    Xarelto was defective when it left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

219.    Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

220.    Plaintiffs used Xarelto in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

221.    Plaintiffs and their healthcare providers did not misuse or materially alter their Xarelto.

222.    As a direct and proximate result of the use of Xarelto, Plaintiffs' suffered serious physical injury (and in some cases death), harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

## COUNT III
### (DESIGN DEFECT)

223.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

224.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiffs.

225.    Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

226.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

227.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as Plaintiffs, when used as intended or as reasonably foreseeable to Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

228.    Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

229.    The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

230.    The risks of harm associated with the design of Xarelto are higher than necessary.

231.    It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiffs specifically were not aware of these risks, nor would they expect them.

232.    The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

233.    Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiffs expected.

234.    The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

235.    At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

236.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiffs.

237.    Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

238.    The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiffs.

239.    As a direct and proximate result of the Plaintiffs' use of the Xarelto, which was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants, Plaintiffs suffered serious physical injury, harm (and in some cases death), damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

240.    Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles regardless of whether arising under statute and/or common law.

## COUNT IV
## (FAILURE TO WARN)

241.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

242.    Defendants had a duty to warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments, twice daily dosing and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

243.    Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

244.    Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of the likelihood that its product would cause these injuries.

245.    Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

246. A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

247. When it left Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

248. Plaintiffs used Xarelto for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

249. Plaintiffs and Plaintiffs' healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

250. Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

251. The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

252. The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting Plaintiffs to risks that exceeded the benefits to the Plaintiffs. Plaintiffs, individually and through their physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

253. Defendants had a continuing duty to warn Plaintiffs and their prescriber of the dangers associated with its product.

254.    Had Plaintiffs or their healthcare providers received adequate warnings regarding the risks associated with the use of Xarelto, they would not have used it or they would have used it with blood monitoring.

255.    The Plaintiffs' injuries (including and in some cases death), were the direct and proximate result of Defendants' failure to warn of the dangers of Xarelto.

256.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT V
## (NEGLIGENCE)

257.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

258.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto including a duty to assure that the product did not cause unreasonable, dangerous side-effects to users.

259.    Defendants failed to exercise ordinary care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto in that Defendants knew, or should have known, that the drugs created a high risk of unreasonable, dangerous side-effects and harm, including life-threatening bleeding, as well as other severe and personal injuries (including in some cases death) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

260.    Defendants, their agents, servants, and/or employees were negligent in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto  in that, among other things, they:

a.    Failed to use due care in designing and manufacturing, and testing Xarelto so as to avoid the aforementioned risks to individuals;

b.    Failed to analyze pre-marketing test data of Xarelto;

c.    Failed to conduct sufficient post-marketing and surveillance of Xarelto;

d.    Failed to accompany the drug with proper warnings regarding all possible adverse side effects associated with its use, and the comparative severity and duration of such adverse effects. The warnings given did not accurately reflect the symptoms, scope or severity of the side effects;  the warnings given did not warn Plaintiffs and their healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto;

e.    Failed to provide adequate training and instruction to medical care providers for the appropriate use of Xarelto;

f.    Falsely and misleadingly overpromoted, advertised and marketed Xarelto as set forth herein including overstating efficacy, minimizing risk and stating that blood monitoring and dose adjustments were not necessary for safe and effective use to influence patients, such as Plaintiffs, to purchase and consume such product;

g.  Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

h.  Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

i.  Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

j.  Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

k.  Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

l.  Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

m.  Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

n.  Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

o.  Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

p.  Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

q.  Negligently designing Xarelto in a manner which was dangerous to its users;

r.  Negligently manufacturing Xarelto in a manner which was dangerous to its users;

s.  Negligently producing Xarelto in a manner which was dangerous to its users;

t.  Negligently assembling Xarelto in a manner which was dangerous to its users;

61

u.   Concealing information from the Plaintiffs in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

v.   Improperly concealing and/or misrepresenting information from the Plaintiffs, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery; and,

w.   Placing an unsafe product into the stream of commerce.

182.   Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

183.   Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

184.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

a.   Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

c.   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

    d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

    e.    Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

    f.    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

    g.    Failed to warn Plaintiffs, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

    h.    Were otherwise careless and/or negligent.

185.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonable, dangerous side-effects which many users would be unable to remedy by any means, Defendants continued to market Xarelto to consumers, including the medical community and Plaintiffs.

186.    Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

187.    It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiffs.

188.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered serious physical injury, harm (and in some cases death), damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

189.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with

the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VI
## (BREACH OF EXPRESS WARRANTY)

190.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

191.    Defendants expressly warranted that Xarelto was safe and effective to members of the consuming public, including Plaintiffs.

192.    Defendants expressly warranted that Xarelto was a safe and effective product to be used as a blood thinner, and did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and life-threatening. The representations were not justified by the performance of Xarelto.

193.    Defendants expressly warranted Xarelto was safe and effective to use without the need for blood monitoring and dose adjustments.

194.    Defendants expressly represented to Plaintiffs, Plaintiffs' physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT

64

and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

195.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

196.    Plaintiffs and their healthcare providers reasonably relied on these express representations.

197.    Xarelto does not conform to these express representations because Xarelto is not safe and has serious side-effects, including death.

198.    Defendants breached their express warranty in one or more of the following ways:

    a.    Xarelto as designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed in to the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

    b.    Defendants failed to warn and/or place adequate warnings and instructions on Xarelto;

    c.    Defendants failed to adequately test Xarelto; and,

    d.    Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from Xarelto.

199.    Plaintiffs reasonably relied upon Defendants' warranty that Xarelto was safe and effective when they purchased and used the medication.

200.    Defendants herein breached the aforesaid express warranties as their drug was defective.

65

201.    Plaintiffs' injuries (and in some cases death) were the direct and proximate result of Defendants' breach of their express warranty.

202.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

### COUNT VII
### (BREACH OF IMPLIED WARRANTY)

203.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

204.    At the time Defendants marketed, distributed and sold Xarelto to Plaintiffs, Defendants warranted that Xarelto was merchantable and fit for the ordinary purposes for which it was intended.

205.    Members of the consuming public, including consumers such as Plaintiffs, were intended third party beneficiaries of the warranty.

206.    Xarelto was not merchantable and fit for its ordinary purpose, because it has a propensity to lead to the serious personal injuries described in this Complaint.

66

207.   Plaintiffs reasonably relied on Defendants' representations that Xarelto was safe and free of defects and was a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

208.   Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injury (including in some cases death).

209.   Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VIII
## (NEGLIGENT MISREPRESENTATION)

210.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

211.   From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made

misrepresentations to Plaintiffs, Plaintiffs' physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived Plaintiffs, Plaintiffs' physicians and the general public as to the health risks and consequences of the use of Xarelto.

212.    The Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

213.    The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to your health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiffs.

214.    The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

215.    In reliance on the misrepresentations by the Defendants, Plaintiffs were induced to purchase and use Xarelto. If Plaintiffs had known the truth and the facts concealed by the Defendants, Plaintiffs would not have used Xarelto. The reliance of Plaintiffs upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

216.    As a result of the foregoing negligent misrepresentations by Defendants, Plaintiffs suffered injuries (including, in some cases, death) and damages as alleged herein.

## COUNT IX
## (FRAUD)

217.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

218.    Prior to Plaintiffs' use of Xarelto and during the period in which Plaintiffs actually used Xarelto, Defendants fraudulently suppressed material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre and post marketing deaths, and the high number of severe adverse event reports compared to other anticoagulants and the need for blood monitoring and dose adjustments for the safe and effective use of Xarelto.  Furthermore, Defendants fraudulently concealed the safety information about the use of Xarelto.  As described above, Xarelto has several well-known serious side-effects that are not seen in other anticoagulants. Plaintiffs believe that the fraudulent misrepresentation described herein was intentional to keep the sales volume of Xarelto strong.

219.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiffs, the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk

69

of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

220.    These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs herein.

221.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiffs used Xarelto, the Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

222.    In reliance upon said representations, Plaintiffs were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

223.    Said Defendants knew and were aware, or should have been aware, that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

224.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

225.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiffs.

226.    Defendants fraudulently concealed the safety issues associated with Xarelto including the need for blood monitoring and dose adjustments in order to induce physicians to prescribe Xarelto and for patients, including Plaintiffs, to purchase and use Xarelto.

227.    At the time Defendants concealed the fact that Xarelto was not safe, Defendants were under a duty to communicate this information to Plaintiffs, physicians, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto.

228.    Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

229.    Plaintiffs and the Plaintiffs' prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of Xarelto.

230.    Plaintiff's prescribing physicians were not provided with the necessary information by the Defendants, to provide an adequate warning to the Plaintiffs.

231.    Xarelto was improperly marketed to the Plaintiffs and their prescribing physicians as the Defendants did not provide proper instructions about how to use the medication and did not adequately warn about Xarelto's risks.

232.    As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Plaintiffs and Plaintiffs' prescribing physicians, Defendants caused or contributed to Plaintiffs' injuries (and in some cases death).

233.    It is unconscionable and outrageous that Defendants would risk the lives of consumers, including Plaintiffs. Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of Xarelto. Defendants' outrageous conduct rises to the level necessary that Plaintiffs should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

234.    Defendants' fraud also acted to conceal their malfeasance which actions tolled Plaintiffs' statute of limitations because only Defendants knew the true dangers associated with the use of Xarelto as described herein.  Defendants did not disclose this information to the Plaintiffs, their prescribing physicians, the healthcare community and the general public. Without full knowledge of the dangers of Xarelto, Plaintiffs could not evaluate whether a person who was injured by Xarelto had a valid claim.

235.    Defendants widely advertised and promoted Xarelto as a safe and effective medication and/or as a safe and effective means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

236.    Defendants' advertisements regarding Xarelto falsely and misleadingly stated that blood monitoring and dose adjustments were not necessary for safe and effective use of the drug, misrepresentations Defendants knew to be false, for the purpose of fraudulently inducing

consumers, such as Plaintiffs, to purchase such product. Plaintiffs relied on these material misrepresentations when deciding to purchase and consume Xarelto.

237.    Defendants had a duty to disclose material information about serious side-effects to consumers such as Plaintiffs.

238.    Additionally, by virtue of Defendants' partial disclosures about the medication, in which Defendants touted Xarelto as a safe and effective medication, Defendants had a duty to disclose all facts about the risks associated with use of the medication, including the risks described in this Complaint. Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as Plaintiffs, to purchase Defendants' dangerous product.

239.    Had Plaintiffs been aware of the hazards associated with Xarelto, Plaintiffs would have employed appropriate blood monitoring, consumed a different anticoagulant with a better safety profile, or not have consumed the product that led proximately to Plaintiffs' injuries (including in some cases death).

240.    Upon information and belief, Plaintiffs aver that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with Xarelto, for the purpose of preventing consumers, such as Plaintiffs, from discovering these hazards.

## COUNT X
## (VIOLATION OF CONSUMER PROTECTION LAWS/CONSUMER FRAUD LAWS)

241.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as

may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

242.    Plaintiffs used Xarelto and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

243.    Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

a.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.    Advertising goods or services with the intent not to sell them as advertised; and,

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

244.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto.

245.    Defendants violated consumer protection laws of various states.

246.    Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as Plaintiffs, in the marketing and advertising campaign described herein.

247.    Defendants' conduct in connection with Xarelto was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts

74

regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

248.    As a result of these violations of consumer protection laws, Plaintiffs have incurred and will incur; serious physical injury (including in some cases death), pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

## COUNT XI
## (LOSS OF CONSORTIUM)

249.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

250.    At all relevant times hereto, where applicable, Plaintiffs had spouses (hereafter referred to as "Spouse Plaintiffs") and/or family members (hereafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of the Plaintiffs' injuries from Xarelto.

251.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

252.     For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

253.     For all Spouse Plaintiffs, Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

254.     Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

255.     As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs, Family Member Plaintiffs, and/or intimate partners of the aforesaid Plaintiffs, have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners jointly and severally for all general, special and equitable relief to which Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners are entitled by law.

## COUNT XII
## (WRONGFUL DEATH)

256.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

257.    Plaintiffs bring this claim, where appropriate, on behalf of the Estate and for the benefit of the Plaintiff Decedents' lawful beneficiaries.

258.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Xarelto as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

259.    As a direct and proximate cause of the conduct of Defendants, Plaintiff Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedents' deaths.  Plaintiffs bring this claim on behalf of Decedents' lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## COUNT XIII
## (SURVIVAL ACTION)

260.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

261.    As a direct and proximate result of the conduct of Defendants, where appropriate, Plaintiff Decedents, prior to their death, were obligated to spend various sums of money to treat his or her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his or her death; and, as a direct and proximate result of the

aforesaid, Decedents suffered a loss of earnings and earning capacity. Plaintiffs bring this claim on behalf of Decedents' estates under applicable state statutory and/or common laws.

262.    As a direct and proximate result of the conduct of Defendants, Plaintiff Decedents and their spouses and heirs, including domestic partners, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

263.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Plaintiff Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiffs' spouses or heirs, including domestic partners, as Administrators or beneficiaries of the estate of the Decedent, bring the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

## VI.    <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

    1.  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

3.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4.  Prejudgment interest;

5.  Postjudgment interest;

6.  Awarding Plaintiff reasonable attorneys' fees when applicable;

7.  Awarding Plaintiff the costs of these proceedings; and

8.  Such other and further relief as this Court deems just and proper.

Respectfully submitted,

KELLEY & FERRARO LLP

Constantine Venizelos (0078596)
Ryan Cavanaugh (0079996)
William Mason (0092747)
2200 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 575-0777
(216) 575-0799 (Facsimile)

Counsel for Plaintiffs